**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 14, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CALLIE ESCUE,

        Plaintiff-Appellant,

    v.

NORTHERN OKLAHOMA
COLLEGE, a political subdivision
of the State of Oklahoma; and
RICHARD FINTON, in his
individual and official capacities,

        Defendants-Appellees.

Nos. 04-6270, 04-6310

---

**APPEALS FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 03-CV-134-HE)**

---

N. Kay Bridger-Riley, Bridger-Riley Bailey & Associates, P.C., Tulsa, Oklahoma
for Plaintiff-Appellant Callie Escue.

Gregory Thomas Metcalf, Assistant Attorney General, (Stefan K. Doughty,
Assistant Attorney General, on the brief) Oklahoma City, Oklahoma, for
Defendant-Appellee Northern Oklahoma College, and for Defendant-Appellee
Richard Finton in his official capacity.

Kenneth R. Coe, Oklahoma City, Oklahoma, for Defendant-Appellee Richard
Finton in his individual capacity.

---

Before **HENRY**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

**HENRY,** Circuit Judge.

Callie Escue, formerly a student at Northern Oklahoma College (NOC), alleges that Richard Finton, her professor in spring 2002, sexually harassed her, and that NOC failed to supervise and investigate adequately Mr. Finton in this, and other prior incidents. The district court granted NOC's motion for summary judgment, and a jury found in favor of Mr. Finton. Here, Ms. Escue appeals the district court's grant of summary judgment to NOC. She also appeals the denial of her motions for judgment as a matter of law and a new trial with respect to her claims against Mr. Finton. Because we hold that (1) NOC did not have prior notice that Mr. Finton presented a substantial risk to its students, (2) its response to Ms. Escue's harassment was not clearly unreasonable, and (3) the jury's verdict in favor of Mr. Finton was not against the weight of the evidence, we affirm the district court.

## I. BACKGROUND

In the spring semester of 2002, Ms. Escue was enrolled in two classes taught by Mr. Finton, a tenured faculty member, at NOC. Ms. Escue contends that during this time, Mr. Finton touched her inappropriately without her consent on multiple occasions and made numerous sexual comments, some about her in front of her peers, and others to her while they were alone. She makes three claims against

Mr. Finton with respect to these allegations: (1) that his conduct violated her due process and equal protection rights and is actionable under 42 U.S.C. § 1983; (2) that he assaulted and battered her in violation of state law; and (3) that he intentionally caused her emotional distress in violation of state law. Mr. Finton admitted to some of the allegations, but contested others. Because of disputes over material facts, the district court denied Mr. Finton's motion for summary judgment.

At trial, Mr. Finton admitted to having made comments about the size of Ms. Escue's breasts on three or four separate occasions, but denied a number of Ms. Escue's other allegations: he testified that he did not look down her pants or her blouse; that he did not tell her about any sexual dreams; that he did not slap her buttocks; that he did not tell her sexual jokes; that he did not tell her that he wanted to fondle her breasts; and that he did not tell her he would use a condom if they had sex. He also admitted to giving Ms. Escue a "sternum adjustment" while lifting up her shirt, in his office with the door locked, but testified that he did not touch her breasts during the adjustment incident, and that she consented to whatever contact occurred. Aplt's App. vol. VI, at 1171 (testifying that a "sternum adjustment" "can realign your ribs on the front side of the sternum" by applying pressure to the sternum and the shoulders).

Thomas Meyer, Ms. Escue's debate partner and close friend, testified during

trial about incidents that he had witnessed between Ms. Escue and Mr. Finton: he had heard Mr. Finton make a number of comments about Ms. Escue and her breasts, and had also seen Mr. Finton pull her shirt so that he could look down her blouse. Mr. Meyer also testified that Mr. Finton sometimes had given massages and adjustments to other students, including himself, and that Ms. Escue twice had gone to Mr. Finton's office to give Mr. Finton a back massage. Mr. Meyer told the jury that he had seen Ms. Escue show tattoos to Mr. Finton that required her to lift part of her clothing. He testified that, after hearing about the sexual harassment claims, he had been "furious" and agreed that he had told a friend that he believed "whatever happened was as much Callie's fault as Finton's." *Id.* vol. V, at 1025.

Ms. Escue also testified during the jury trial. She described instances of inappropriate contact, and maintained that during the sternum adjustment, Mr. Finton had fondled her breasts. *Id.* vol. VI, at 1265 (Mr. Finton pulling down her shirt), 1267 (describing "jokes" and comments made by Mr. Finton), 1274 (Mr. Finton looking down her pants and moaning), 1277 (Mr. Finton fondling her breasts in his office during the adjustment). During her testimony, she admitted that she had sent a Valentine's Day card to Mr. Finton, that she did not object to the sternum adjustment and had voluntarily laid on the floor of his office, and that after the sternum-adjustment incident in his office, she had remained in his office and smoked a cigarette with him.

4

Shortly after the sternum-adjustment incident in Mr. Finton's locked office, Ms. Escue's father became involved and together, Ms. Escue and her father contacted NOC's president, Dr. Joe Kinzer. The next day, they met in person with Dr. Kinzer to discuss the allegations and to express Ms. Escue's concern that her allegations remain confidential. Her concerns about confidentiality were founded because another student had already told Mr. Finton that Ms. Escue had planned to inform NOC officials about her allegations. That night, after meeting with Dr. Kinzer, Ms. Escue decided to stay at her parents' home because Mr. Finton had gone to her dormitory to try to find her; she had not been there and may have been in the meeting during his visit. NOC officials met with Mr. Finton the day after meeting with Ms. Escue and her father, and informed him of the allegations. After this point, Ms. Escue and Mr. Finton had no further contact.

NOC decided to transfer Ms. Escue out of one of Mr. Finton's classes, permitted her to finish the other class as of March with her then-current grade, and began an investigation into her allegations. After its investigation, NOC decided that it would terminate its relationship with Mr. Finton at the end of the spring semester; although he had planned to retire at the end of the spring or summer semester, he had been slated to teach a class in the summer, and possibly later, on an adjunct basis.

Prior to the alleged harassment in spring 2002, NOC had been aware of

other sexual incidents involving Mr. Finton and students. In 1993, two students had lodged sexual harassment complaints against Mr. Finton. One student reported that he had called her "butch" on multiple occasions and another alleged that he had slapped her buttocks once while she boarded a bus. In response to these two students' allegations, Dr. Kinzer verbally reprimanded Mr. Finton and referred the matters to a dean at NOC. Mr. Finton admitted to calling one student "butch" and promised to stop, but he stated that he had only touched the other student by accident with his elbow. No one at NOC placed any record of the complaints or reprimand in Mr. Finton's personnel file and no action was taken against Mr. Finton as a result of these allegations.

Then, in 1995 or 1996, Dr. Kinzer received an anonymous letter that reported Mr. Finton had dated an unnamed student. When confronted, Mr. Finton told Dr. Kinzer that he had dated a student in 1991-1992. Mr. Finton was again verbally reprimanded, but Dr. Kinzer did not record any information about this in Mr. Finton's personnel file. Later, during his deposition, Mr. Finton explained that the person referenced in this letter had been an older, non-traditional student who had not been in any of Mr. Finton's classes. During his deposition, Mr. Finton also admitted to a second relationship with another older, non-traditional student who had been in one of his classes. Both Dr. Kinzer and Mr. Finton testified during their depositions that NOC had no knowledge of this second

6

relationship.

Based on these prior incidents and what Ms. Escue alleged was an inadequate investigation into her allegations, she made two claims against NOC: (1) that it negligently supervised Mr. Finton in violation of state law, and (2) that it violated Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, by failing to remedy an abusive and/or hostile educational environment. After receiving cross-motions for summary judgment from Ms. Escue and NOC, the district court granted summary judgment to NOC with respect to both claims. In its order granting NOC summary judgment, the court stated that the evidence was "somewhat confusing" as to which student the letter referenced, but "the court's decision on NOC's liability would not change even if Dr. Kinzer had understood the letter pertained to a relationship between Finton and a student other than [the older, non-traditional student who had not been in any of Mr. Finton's classes]." Aplt's App. vol. IV, at 821 n.9 (Dist. Ct. Order, filed June 30, 2004).

## II. DISCUSSION

In this consolidated appeal, Ms. Escue challenges the district court's grant of summary judgment to NOC. She also challenges the district court's denial of her motion for judgment as a matter of law and the denial of her motion for a new trial with respect to her claims against Mr. Finton, contending the verdict was not supported by the evidence. We first consider Ms. Escue's arguments as they relate

7

to NOC.

## A.     Arguments Pertaining to Defendant NOC

The district court held that there were no issues of material fact in dispute with respect to Ms. Escue's claims against NOC, that NOC did not violate Title IX, and that NOC did not negligently supervise Mr. Finton.[1] In her brief on appeal, Ms. Escue does not contend that there are any issues of material fact that would preclude summary judgment; rather, she argues that the district court incorrectly applied the law in granting NOC summary judgment.

We review the district court's grant of summary judgment de novo. *Sports Unlimited v. Lankford Enters.*, 275 F.3d 996, 999 (10th Cir. 2002). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We must view the evidence and all inferences that might be

---

[1] The district court also noted that, in her response to NOC's summary judgment motion, Ms. Escue explained that "she did not intend to sue NOC under § 1983 or assert assault, battery, or intentional infliction of emotional distress claims against the college. Those claims against NOC are, therefore, dismissed." Aplt's App. vol. IV, at 819 n.2; *see also id.* vol. III, at 469 (Pl.'s Resp. to Mot. for Summ. J., filed Apr. 29, 2004). In her brief on appeal, Ms. Escue states that "[t]he District Court erred in granting Northern Oklahoma College's *Motion for Summary Judgment* on Ms. Escue's claims under . . . § 1983, [and] state law claims for assault, battery, intentional infliction of emotional distress . . . ." Aplt's Br. at 1. Because Ms. Escue expressly disclaimed her intent to sue NOC under these theories, she cannot renew these abandoned claims on appeal, especially given that Ms. Escue makes no argument that dismissal of these claims pursuant to Federal Rule of Civil Procedure 41(b) was improper.

8

reasonably drawn from it in the light most favorable to Ms. Escue. *See Sports Unlimited*, 275 F.3d at 999.

1.   Title IX Claim

Ms. Escue argues that NOC is liable under Title IX for Mr. Finton's alleged sexual harassment. Title IX provides that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal assistance." 20 U.S.C. § 1681(a). Pursuant to its power under section five of the Fourteenth Amendment, "Congress abrogated the States' Eleventh Amendment immunity under Title IX," *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 72 (1992), and therefore a school such as NOC may properly be sued by its students. *See also* 42 U.S.C. § 2000d-7(a)(1) ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . title IX of the Education Amendments of 1972.").

Sexual harassment is a form of discrimination on the basis of sex and is actionable under Title IX. *Franklin,* 503 U.S. at 75. NOC, however, is not vicariously liable to its students for all sexual harassment caused by teachers, and the Supreme Court has held that, under Title IX, a student may hold a school liable "only for its own misconduct." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640 (1999).

9

As we have explained, this sort of supervisory liability is imposed: (1) "only if the [school] remains deliberately indifferent to acts of harassment of which it has actual knowledge," *Murrell v. Sch. Dist. No. 1, Denver, Colo.,* 186 F.3d 1238, 1246 (10th Cir. 1999), (2) the harassment was reported to an "appropriate person . . . with the authority to take corrective action to end the discrimination," *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998), and (3) the harassment was "so severe, pervasive and objectively offensive that it . . . deprived the victim of access to the educational benefits or opportunities provided by the school," *Murrell*, 186 F.3d at 1246. Here, it is not contested that Ms. Escue reported the harassment to an appropriate person, Dr. Kinzer, satisfying the second element. *See* Aplt's Br. at 10-11.

Ms. Escue presents two different theories of liability to satisfy elements one and three. First, she asserts that NOC had actual knowledge that Mr. Finton sexually harassed students before Ms. Escue was a student, to which it was deliberately indifferent. Thus, Ms. Escue argues that this deliberate indifference to known acts of harassment caused Ms. Escue to be subjected to harassment by Mr. Finton and deprived her of educational opportunities. Her second theory of liability is that, after becoming aware of Ms. Escue's allegations against Mr. Finton, NOC was deliberately indifferent to her complaints of harassment, also causing her to be deprived of educational opportunities.

10

Below, we examine each theory in turn. Because we conclude (1) that the prior incidents were not sufficient to provide NOC with actual knowledge that employing Mr. Finton put its student at substantial risk of being harassed, and (2) that NOC was not deliberately indifferent to Ms. Escue's allegations, we hold that the district court properly granted summary judgment to NOC.

<u>a.</u>    <u>Actual Knowledge of Prior Acts of Harassment</u>

Ms. Escue first argues that the district court erred by deciding that "[t]he information NOC/Kinzer possessed cannot be equated with the 'actual knowledge' required to impose liability under Title IX." Aplt's App. vol. IV, at 824. The district court reasoned that NOC did not have this knowledge because "[t]he incidents of which it was aware were too dissimilar, too infrequent and/or too distant in time . . . to impose liability on NOC for its failure to take action" before Ms. Escue's claims arose. *Id.* For the reasons explained below, we agree with the district court's analysis of this issue.

In *Gebser*, the Supreme Court explained that to make a Title IX claim against a school for sexual harassment, the plaintiff must show an appropriate person, (here, Dr. Kinzer), had "actual knowledge of discrimination *in the recipient's [NOC's] programs*." 524 U.S. at 290 (emphasis added). By noting that actual knowledge of discrimination in *the recipient's program* is sufficient, the Court implicitly decided that harassment of persons other than the plaintiff

11

may provide the school with the requisite notice to impose liability under Title IX. *See id.* Thus, under *Gebser*, if Dr. Kinzer or another "appropriate person" has actual knowledge of discrimination in NOC's programs, this is sufficient to satisfy the "actual knowledge" prong of Title IX liability. *See id.*

Lower courts differ on whether notice sufficient to trigger liability may consist of prior complaints or must consist of notice regarding current harassment in the recipient's programs. *Compare Johnson v. Galen Health Insts., Inc.*, 267 F. Supp. 2d 679, 688 (W.D. Ky. 2003) (collecting cases and explaining that "the *Gebser* notice standard does not require that the offending instructor actually commit previous acts of harassment against the plaintiff-student and that the plaintiff-student complain before the institution may be held liable for the instructor's subsequent repeated misconduct under Title IX. Actual knowledge of intentional discrimination and actual knowledge of the actual plaintiff's experiences are two different things."), *with Baynard v. Malone*, 268 F.3d 228, 238 (4th Cir. 2001) (requiring "a showing that school district officials possessed actual knowledge of the discriminatory conduct in question"). Even under the more permissive stance that allegations of prior conduct suffice to impose liability, we conclude Ms. Escue has not met this burden.

The district court reasoned that the prior instances were "too dissimilar, too infrequent, and/or too distant in time" to provide the school with actual knowledge

12

of sexual harassment in its programs.  Aplt's App. vol. IV, at 824.  In this case, we agree with this analysis.

The Supreme Court in *Gebser* noted that one complaint of a teacher making inappropriate comments "was plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." 524 U.S. at 291.  Although *Gebser* makes clear that "actual notice requires more than a simple report of inappropriate conduct by a teacher . . . the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student." *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999).  Generally, the district courts that have examined the issue have required that the school have "actual knowledge of a *substantial risk* of abuse to students based on prior complaints by other students."  *Doe A. v. Green*, 298 F. Supp. 2d 1025, 1033 (D. Nev. 2004) (emphasis added) (citing *Johnson*, 267 F. Supp. 2d at 688 (finding same)).   Prior instances need not be "clearly credible [because] . . . [*a*]*t some point* . . . a supervisory school official knows . . . that a school employee is a substantial risk to sexually abuse children."  *Gordon v. Ottumwa Cmty. Sch. Dist.*, 115 F. Supp. 2d 1077, 1082 (S.D. Iowa 2000) (internal quotation marks omitted).

The instances of dating two non-traditional students nearly his own age do not provide NOC with any knowledge that Mr. Finton posed a substantial risk of

13

sexual harassment to NOC's students: even though one of these relationships may have been improper (the district court noted that one of the dating relationships did not even violate school policy, even though it was not condoned, Aplt's App. vol. IV, at 821), there is no insinuation anywhere in the record that these relationships were non-consensual.

The other two instances where Mr. Finton received complaints concerning inappropriate behavior of a sexual nature occurred nearly a decade before Ms. Escue's complaints, and involved significantly different behavior – a single incident of inappropriate touching and a series of inappropriate name-calling. When confronted, Mr. Finton had told NOC that the touching was an accident and had acknowledged the name-calling should stop. These two episodes do not provide NOC with actual knowledge that Mr. Finton presented a "substantial risk of abuse" to other students – indeed, one of the incidents involved no physical contact whatsoever, the other was an isolated incident, and neither involved anywhere near the degree of overt and pervasive harassment that Ms. Escue alleges constituted a hostile educational environment. *See Gesner*, 524 U.S. at 291; *Simpson v. Univ. of Colo.,* 372 F. Supp. 2d 1229, 1235-36 (D. Colo. 2005) (holding that "the risk must remain focused . . . [t]he more a risk becomes generalized, the more that risk is likely to fall outside of the narrowly circumscribed scope of Title IX liability"); *Gordon*, 115 F. Supp. 2d at 1082

14

(stating that "actual notice 'requires more than a simple report of inappropriate conduct' on the part of a school employee") (quoting *Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d at 62). Especially given that nearly ten years passed without additional allegations, NOC simply did not have the requisite knowledge based on prior complaints to believe that Mr. Finton presented a substantial risk of abuse or harassment to students.

### b.   Deliberate Indifference

We now turn to Ms. Escue's second argument: that once she informed NOC of her allegations against Mr. Finton, its response was minimal and insufficient, and therefore NOC was deliberately indifferent to known acts of harassment. NOC does not dispute that, once Ms. Escue made her allegations about Mr. Finton, it had sufficient "actual knowledge" of sexual harassment under Title IX. Rather, NOC responds that it was not deliberately indifferent to Ms. Escue's allegations because its actions were not "clearly unreasonable in light of the known circumstances" and because its response to the harassment did not "cause [Ms. Escue] to undergo harassment or make [her] vulnerable to it." *Davis*, 526 U.S. at 643, 648. The district court held that in light of the "high standard" required for imposing liability under Title IX, NOC's response to Ms. Escue's allegations was not clearly unreasonable. Aplt's App. vol. IV, at 825. We agree.

Although certainly a "minimalist response is not within the contemplation

15

of a reasonable response," *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000), NOC's response was not minimal. After meeting with Ms. Escue and her father and learning of her allegations against Mr. Finton, NOC permitted Ms. Escue to transfer out of Mr. Finton's class and into one that was substantially similar. It allowed her to stop taking his debate class and take her grade as of that time, mid-way through the semester. NOC also confronted Mr. Finton with the allegations, asked two other students about the allegations, and determined that the school's relationship with him would permanently end after the semester.

Thus, NOC argues that it took "steps to prevent further and future contact between Appellant and Finton." Aple. NOC's Br. at 17. Ms. Escue argues that NOC should have removed Mr. Finton from the classroom, and specifically instructed him to keep away from her. Moreover, Ms. Finton alleges that NOC's investigation into her allegations was not significant until she filed this lawsuit.

Although NOC might have taken more aggressive action against Mr. Finton, it does not follow that the college was deliberately indifferent. School administrators need not "engage in particular disciplinary action," *Davis*, 526 U.S. at 648, and "[v]ictims do not have a right to seek particular remedial demands," *Theno v. Tonganoxie Unified Sch. Dist. No. 464,* 377 F. Supp. 2d 952, 965 (D. Kan. 2005). Moreover, NOC had no "knowledge that its remedial action [was]

16

inadequate and ineffective." *Vance*, 231 F.3d at 261. NOC removed Ms. Escue from the harassing environment and immediately questioned two of her peers and Mr. Finton about the charges. It also determined to prevent Mr. Finton from teaching any other classes after the semester ended. We conclude that these actions constitute "timely and reasonable measures to end the harassment." *Wills v. Brown Univ.*, 184 F.3d 20, 25 (1st Cir. 1999). Because this response was not "clearly unreasonable in light of the known circumstances," *Davis*, 526 U.S. at 643, NOC was not deliberately indifferent to Ms. Escue's harassment, as a matter of law.

Significantly, we note that Ms. Escue does not allege that further sexual harassment occurred as a result of NOC's deliberate indifference. The Supreme Court has stated that "the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Id.* at 644-45 (internal quotation marks omitted). For instance, in *Theno*, a student was subjected to years of harassment by his peers. Although the school responded to discrete incidents, it issued only warnings to the perpetrators and sometimes required them to undergo counseling. Despite these measures, the student was still harassed. The *Theno* court found that summary judgment was inappropriate because "a reasonable jury certainly could conclude that at some point during the four-year period of harassment the school district's standard and ineffective

17

response to the known harassment became clearly unreasonable." *Theno,* 377 F. Supp. 2d at 965.

Ms. Escue's arguments do not present a similar situation. At no point does she allege that NOC's response to her allegations was ineffective such that she was further harassed. Although Mr. Finton attempted to contact her once the day that she reported her allegations to Dr. Kinzer, he was unsuccessful and this incident did not lead to sexual harassment. Summary judgment on these facts is therefore appropriate, as Ms. Escue has not shown that NOC's response was clearly unreasonable nor has she shown that it led to further sexual harassment. *See Davis*, 526 U.S. at 649 ("In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law.").

2.    Negligent Supervision

The district court also granted NOC summary judgment on Ms. Escue's claim that NOC is liable for negligent supervision. In Oklahoma, an employer may be held liable for negligent supervision "if – at the critical time of the tortious incident – , the employer had reason to believe that the person would create an undue risk of harm to others. Employers are held liable for their prior knowledge of the servant's propensity to commit the very harm for which damages are sought." *New Hampshire v. Presbyterian Church (U.S.A.)*, 998 P.2d 592, 600 (Okla. 1999). We substantially agree with the district court's

18

reasoning that this element of the Oklahoma tort of negligent supervision largely overlaps with the "actual knowledge" prong of Title IX liability. *See* Aplt's App. vol. IV, at 827. Therefore, for the same reasons that NOC did not have sufficient knowledge, based on the prior incidents, to believe that Mr. Finton presented a substantial risk of abuse to students, "[t]he information the school possessed about Finton's behavior did not apprise NOC of Finton's 'propensity to commit the very harm' for which the plaintiff now sues the college." *Id.* (quoting *Presbyterian Church (U.S.A.)*, 998 P.2d at 600).

**B.     Arguments Pertaining to Defendant Finton**

Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, Ms. Escue asked the district court to grant a new trial, or in the alternative, grant judgment as a matter of law as to each of her three claims against Mr. Finton: (1) deprivation of constitutional rights, actionable under § 1983; (2) assault and battery under state law; and (3) intentional infliction of emotional distress under state law. We review de novo the district court's denial of Ms. Escue's motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. *Loughridge v. Chiles Power Supply Co.*, 431 F.3d 1268, 1280 (10th Cir. 2005). We make all reasonable inferences in favor of the non-moving party. *Id.* "Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." *Id.* (internal quotation marks omitted).

We review the district court's denial of Ms. Escue's motion for a new trial

19

for abuse of discretion, viewing all the evidence in the light most favorable to the prevailing party. *Snyder v. City of Moab*, 354 F.3d 1179, 1187-88 (10th Cir. 2003). "[A] motion for a new trial on the grounds that the jury verdict is against the weight of the evidence normally involves a review of the facts presented at trial, and thus involves the discretion of the trial court." *Black v. Heib's Enters.*, 805 F.2d 360, 363 (10th Cir. 1986). Thus, even if we do not necessarily agree with the jury's verdict, it must be upheld unless it is "clearly, decidedly or overwhelmingly against the weight of the evidence." *Id.*

    1.    <u>Section 1983 Claim</u>

The district court instructed the jury that, to find in favor of Ms. Escue on this claim, it had to find the following to be true: (1) Mr. Finton had deprived her of a constitutional right, (2) he acted under color of state law, and (3) his actions were the proximate cause of the injuries and damages she sustained. Aplt's App. vol. IV, at 864; *see* 42 U.S.C. § 1983. The jury was instructed that, with regard to the second prong of that test, Mr. Finton had acted under color of state law. Aplt's App. vol. IV, at 866.

The district court further instructed that, with regard to the first prong of that test, Mr. Finton violated Ms. Escue's constitutional right to be free from sex discrimination under the equal protection clause of the Fourteenth Amendment if the jury found that: (1) Mr. Finton's conduct subjected her to sex discrimination,

20

(2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive as to interfere unreasonably with her school performance and create a hostile or abusive educational environment. *Id.* at 865; *see also Lipset v. Univ. of P.R.*, 864 F.2d 881, 898 (1st Cir. 1988) (explaining that, under the equal protection clause, a plaintiff makes a "prima facie case of hostile environment harassment" by showing that "he or she was subjected to unwelcome sexual advances so 'severe or pervasive' that it altered his or her working or educational environment") (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)). Therefore, if the jury determined that the conduct was not unwelcome or that Ms. Escue consented to the contact, it could not have found in favor of her on this claim.

The Supreme Court has observed that "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Meritor Sav. Bank,* 477 U.S. at 68 (examining a sexual harassment suit brought under Title VII). Although a jury could have found in Ms. Escue's favor on this claim had it favored her testimony about the incidents, if a jury did not credit her version of events, there was sufficient evidence for it to find that Mr. Finton's conduct was not unwelcome.

Ms. Escue testified that she did not welcome the conduct, and Mr. Meyer

21

testified that the look on her face during the incidents that he witnessed showed that Mr. Finton's actions were unwelcome. However, the jury need not have found this testimony credible. Moreover, the jury could have found that some of Ms. Escue's testimony tended to show that Mr. Finton's conduct was not unwelcome: Ms. Escue admitted that she never verbally objected to any of the conduct, that she explicitly consented to the sternum adjustment and voluntarily laid on Mr. Finton's office floor, and that she sent Mr. Finton a Valentine's Day card. Mr. Meyer's testimony that Ms. Escue went to Mr. Finton's office to give Mr. Finton back massages and showed him tattoos that were under her clothing also could have permitted the jury to draw the inference that Mr. Finton's conduct was not unwelcome. Therefore, viewing the evidence in the light most favorable to Mr. Finton, the jury's verdict on Ms. Escue's § 1983 claim was not against the weight of the evidence, and the district court correctly denied Ms. Escue's motions for a directed verdict and new trial.

### 2. Assault and Battery Claim

The district court instructed the jury that even if it found that an assault or battery occurred, "[d]efendant is not liable to Plaintiff on her claim of assault or her battery claim if he proves his affirmative defense of consent." Aplt's App. vol. IV, at 870; *see also Taylor v. Hesser*, 991 P.2d 35, 39 (Okla. Civ. App. 1998). Mr. Finton could have proved consent by showing that Ms. Escue led him

22

reasonably to believe that she consented to his contact, and that the contact was the same or substantially similar to the contact to which she consented. Aplt's App. vol. IV, at 870. Mr. Finton argues that the jury had sufficient evidence to find that he proved his affirmative defense of consent.

Under Oklahoma law, consent does not always need to be verbal; it can be inferred from a person's actions. "'If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact.'" *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1219 (10th Cir. 2003) (quoting RESTATEMENT (SECOND) TORTS § 892(2)) (applying Oklahoma law). Similarly, the Third Circuit has explained that "[e]xpress consent may be given by words or affirmative conduct and implied consent may be manifested when a person takes no action, indicating an apparent willingness for the conduct to occur." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 148 (3d Cir. 1998) (citing RESTATEMENT (SECOND) TORTS § 892 cmt. b & c).

Viewing the evidence in the light most favorable to Mr. Finton, the jury verdict is not against the weight of the evidence. Even if Mr. Finton's own admissions during trial showed that he committed the prima facie elements of both assault and battery, as Ms. Escue contends, the jury could have found that Ms. Escue led Mr. Finton to believe that she consented to his contact, or contact that

23

was substantially similar. As explained above with respect to her § 1983 claim, Ms. Escue admitted that she never objected to Mr. Finton's conduct, she voluntarily went to his office on a number of occasions, gave him back massages, gave him a Valentine's Day card, consented to the sternum adjustment, and remained in his office after the sternum-adjustment incident. Mr. Finton maintained at trial that, during the sternum adjustment, he did not, in fact, touch Ms. Escue's breasts. The jury was not required to credit Ms. Escue's testimony that she did not consent to or welcome Mr. Finton's conduct because "[i]t is the jury's exclusive province to assess the credibility of witnesses and determine the weight to be given to their testimony." *Lamon v. City of Shawnee*, 972 F.2d 1145, 1159 (10th Cir. 1992). From Ms. Escue's admissions, coupled with Mr. Meyers's and Mr. Finton's testimony, a reasonable jury had sufficient evidence to find that she implicitly consented to the conduct.

3.    Intentional Infliction of Emotional Distress Claim

As the district court instructed, for the jury to find in favor of Ms. Escue on her intentional infliction of emotional distress claim, she had to prove that: (1) Mr. Finton's conduct was so extreme and outrageous that it went beyond all possible bounds of decency; (2) the conduct would be considered atrocious and intolerable in a civilized society; and (3) Mr. Finton intentionally or recklessly caused severe

24

emotional distress to Ms. Escue beyond that which a reasonable person could be expected to endure. Aplt's App. vol. IV, at 868; *see also Gaylord Entm't Co. v. Thompson*, 958 P.2d 128, 149 (Okla. 1998) (characterizing tort of intentional infliction of emotional distress as "narrow" and explaining that "[c]onduct which, though unreasonable, is neither 'beyond all possible bounds of decency' in the setting in which it occurred, nor is one that can be 'regarded as utterly intolerable in a civilized community' falls short of having actionable quality") (quoting RESTATEMENT (SECOND) OF TORTS § 46).

As explained above, a reasonable jury could have concluded that Ms. Escue consented to the events that occurred. Given this, it follows that the same jury would likely not have found that Mr. Finton's conduct was extreme and outrageous, or "beyond all possible bounds of decency." *Gaylord Entm't Co.*, 958 P.2d at 149 (quotation marks omitted).

Even if Mr. Finton's conduct had met this high standard, the jury could have reasonably concluded that the emotional distress Ms. Escue suffered was not severe enough to impose liability on Mr. Finton. In *Daemi v. Church's Fried Chicken*, we held that there was insufficient evidence to establish that the plaintiff suffered severe emotional distress, where the plaintiff alleged that he was sick to his stomach, nervous, insecure, unrestful, no longer acted like himself, and that he had to discuss the complained-of conduct with a therapist he was consulting for

25

different problems. 931 F.2d 1379, 1389 (10th Cir. 1991) (applying Oklahoma law). We explained that to prevent a claim of intentional infliction of emotional distress "from becoming a panacea for all of life's ills, . . . distress [sufficient to support the claim] is often accompanied by shock, illness, or other bodily harm, but bodily harm is not a prerequisite." *Id.* (internal quotation marks omitted).

Here, Ms. Escue complains that, as a result of Mr. Finton's conduct, she suffered from fear, could not sleep, had nightmares, suffered from depression, and was subjected to ridicule and humiliation by her peers. The jury could have reasonably found that Ms. Escue's testimony regarding these effects was not credible, as Ms. Escue did not proffer any evidence besides her own testimony to prove that she suffered emotional distress. Moreover, her allegations are quite similar to those that we held "legally insufficient" in *Daemi* – inability to sleep, personality changes, physical manifestations of stress (in *Daemi* through stomach problems, and for Ms. Escue, depression), nervousness, and fear. *See id.* Therefore, the jury did not act against the weight of the evidence by finding that Ms. Escue had not met her burden of proof with respect to the intentional infliction of emotional distress claim.

## III. CONCLUSION

For the reasons explained above, we AFFIRM the district court's grant of summary judgment to NOC. We also AFFIRM the district court's denial of Ms.

26

Escue's motions for a new trial and judgment as a matter of law with respect to her claims against Mr. Finton.