**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 11, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RAY LEVELLE,

        Plaintiff - Appellee,

v.

PENSKE LOGISTICS, a subsidiary of
Penske Truck Leasing Corporation,

        Defendant - Appellant.

No. 05-1216

(D.C. No. 02-F-2220 (PAC))

(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **BALDOCK**, and **McCONNELL**, Circuit Judges.

## I. Introduction

Ray LeVelle sued his former employer, Penske Logistics ("Penske"), in the United States District Court for the District of Colorado. Among other claims, LeVelle alleged Penske violated the Americans with Disabilities Act ("ADA") when it terminated his employment after learning he was working subject to doctor-recommended lifting restrictions. The ADA claim proceeded to a jury

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

trial. LeVelle prevailed, and the jury awarded him compensatory damages, back-pay, and punitive damages. The district court awarded LeVelle attorneys' fees and costs. Penske appeals from both the judgment and the court's award of attorneys' fees. This court exercises jurisdiction pursuant to 28 U.S.C. § 1291. We **affirm** in part, **vacate** in part, and **remand** for further proceedings not inconsistent with this opinion.

## II. Background

"When reviewing a jury verdict, we review the record in favor of the prevailing party, and give that party the benefit of all reasonable inferences to be drawn from the evidence." *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1108 (10th Cir. 2005) (quotation omitted). Viewed in this light, the record reveals the following. From 1996 to March 1999, and again from November 1999 to February 2001, LeVelle worked for Penske delivering and installing household appliances such as refrigerators, washers, dryers, dishwashers, ranges, and cook tops. LeVelle started out at Penske as a driver's helper. Helpers were responsible for the "grunt work" of preparing appliances for installation and moving appliances from a delivery truck into customers' homes using a dolly. Later, LeVelle became a driver. Drivers assessed delivery logistics, assisted the helper in moving appliances, disconnected old appliances, connected new appliances, dealt with paperwork, and interacted with customers.

In March 2000, LeVelle slipped while delivering an appliance and injured his back. After the injury, he filed a report at work and sought medical treatment at the health-care provider Penske used in cases of employee injuries. LeVelle's physicians told him he could not return to work. As a consequence, LeVelle did not work from March 16, 2000 until October 9, 2000. During this time, LeVelle underwent physical therapy and received workers' compensation benefits.

In September 2000, Dr. Robert Kawasaki gave LeVelle an impairment assessment and functional capacity evaluation. Dr. Kawasaki determined LeVelle had reached maximum medical improvement, but noted LeVelle had "some significant limitations regarding his work capabilities." Dr. Kawasaki recommended the following work restrictions:

1. For all lifting below the shoulder level, I recommend a light duty category with 40 pounds maximum occasionally, 20 pounds frequently, and 10 pounds constantly.
2. For lifting overhead I recommend 20 pounds maximum occasionally, 10 pounds frequently, and 5 pounds constantly.
3. For push and pull, I recommend 80 pounds maximum occasionally, 40 pounds frequently, and 20 pounds constantly.
4. The patient will need to alternate activities between sitting, standing, and walking as needed for comfort.

App. at 693. Dr. Kawasaki also determined LeVelle had an impairment of eleven percent of the whole person.[1]

_____

[1]In December 2000, LeVelle underwent a separate medical examination, performed by Dr. David Reinhard. Dr. Reinhard agreed with Dr. Kawasaki that LeVelle had reached maximum medical improvement by September 2000 and

(continued...)

-3-

In October 2000, LeVelle gave his medical reports, including the recommended work restrictions, to Brett Carl, Penske's logistics center manager at the time. LeVelle testified he and Carl discussed the doctor-recommended work restrictions, and LeVelle assured Carl he would be able to perform his job as a driver. At the conclusion of the conversation, Carl told LeVelle he could return to work at Penske. At first, Penske teamed LeVelle with an experienced driver who evaluated LeVelle's ability to perform the job. After a week or so, Penske gave LeVelle his own truck and a helper, and he returned to his former position as a driver. LeVelle worked as a driver for Penske for the next several months without any problems, working approximately the same hours and making approximately the same number of deliveries as other Penske drivers.

In December 2000, Penske asked LeVelle to install a set of appliances that had already been delivered to a customer's house. After arriving at the job site, LeVelle and his helper discovered one of these appliances was a KSS refrigerator, a large and heavy style of refrigerator. Installation of a KSS refrigerator required a special type of dolly and at least one extra person. Because LeVelle did not have the special dolly or the extra help, he did not install the refrigerator.

[1](...continued)
agreed with Dr. Kawasaki's recommended work restrictions. Dr. Reinhard, however, concluded LeVelle's impairment rating was seventeen percent of the whole person.

LeVelle's failure to install the KSS refrigerator was, in part, the subject of a meeting between LeVelle and his supervisors in late January 2001. At the meeting, LeVelle explained to his supervisors he could not install the appliance because he did not have the correct dolly or the required number of people. LeVelle also told his supervisors he was still working subject to doctor-recommended weight restrictions, and expressed to them his concern that installing a KSS refrigerator without the special dolly and extra help might adversely affect his back. LeVelle's supervisors ended the meeting, and LeVelle resumed his normal duties as a driver.

By the time of the meeting, Carolyn Jo Ward had replaced Brett Carl as Penske's logistics center manager. Ward testified that, until the meeting, she was not aware LeVelle was working subject to medical restrictions. She told the jury that after the meeting with LeVelle, she looked through her files and asked other Penske departments for information on LeVelle's restrictions. Approximately one week after the meeting, Ward obtained workers' compensation and medical records concerning LeVelle's back injury and restrictions. Ward reviewed LeVelle's records and discussed his situation with Penske's risk management department. Ward told the jury she was concerned that if a driver who had already suffered an on-the-job injury returned to work, he could re-injure himself.

On February 14, 2001, Ward called LeVelle into her office and told him he could not work as a driver in light of the medical restrictions placed on him by his

doctors. Ward assured LeVelle she would put him back on workers' compensation, even though LeVelle told Ward he was no longer eligible to receive workers' compensation benefits. LeVelle testified he asked Ward whether he could work at Penske in some other capacity. According to LeVelle, Ward said she would talk to someone and let him know.

At trial, Ward testified she did not consider employing LeVelle in any capacity other than as a driver and did not consider any alternative to terminating LeVelle's employment with Penske. Ward also told the jury she did not ask anyone in her office or in the adjoining Penske division whether there was any light-duty work available for LeVelle. She explained she knew the operation, and there was no need to ask anyone else about available jobs. During her testimony, Ward conceded there was a vacant transportation clerk position at the time LeVelle was terminated, but noted she did not have approval to fill the position at that time.

After Ward told LeVelle he could not work as a driver, LeVelle discovered an adjoining Penske division was in need of a "retail" driver. LeVelle testified retail drivers delivered cabinets from one loading dock to another and were not subject to the same physical demands as drivers who installed appliances. The manager of the adjoining Penske division offered LeVelle the retail driver job, subject to approval from Penske's human resources department. According to

LeVelle, the manager later told him Penske's human resources department would not allow him to have the retail driver job.

On February 28, Ward gave LeVelle a letter informing him he was being placed back on workers' compensation. LeVelle insisted he was not eligible for workers' compensation and convinced Ward to look into the matter further. Ward called LeVelle later that day and told him he was correct, she could not place him back on workers' compensation. Ward told LeVelle she had another letter for him, and asked him to return the first letter she had given him.

LeVelle complied with Ward's request, and Ward gave him the second letter. The new letter terminated LeVelle's employment at Penske, effective March 1, 2001. Ward testified she terminated LeVelle because she believed his doctor-recommended restrictions precluded him from doing the type of heavy-duty work required of Penske drivers. She also stated she believed her decision not to allow LeVelle to work as a driver was in the interest of LeVelle's safety, as well as the safety of other Penske employees.

The letter terminating LeVelle stated, "Due to no work being available at this time, you are terminated effective immediately." App. at 687. LeVelle told the jury he inquired about the wording of the letter with Terry Cooley, who worked in Penske's human resources department. LeVelle explained to Cooley he felt the letter was misleading when Penske had terminated LeVelle due to his medical restrictions, not because there was no work available. Cooley told

-7-

LeVelle the letter would work better for him as it was written. If the letter stated LeVelle was terminated because of his restrictions, Cooley said, it would interfere with LeVelle's ability to get another job by letting other employees know of his restrictions.

After his termination, LeVelle filed suit against Penske. LeVelle alleged Penske violated the ADA by terminating him because it regarded him as disabled. LeVelle also brought claims for racial discrimination and wrongful termination. The district court granted summary judgment to Penske on the racial discrimination and wrongful termination claims. LeVelle's ADA claim, however, proceeded to a jury trial.

At trial, LeVelle argued he was qualified for protection under the ADA because the evidence showed Penske regarded him as having a disability. *See* 42 U.S.C. § 12102(2)(C). The jury agreed; it found LeVelle was a qualified individual and Penske regarded LeVelle as disabled. LeVelle also contended Penske violated the ADA because the evidence showed its termination of him was motivated by its perception that he was disabled. Again, the jury agreed, finding Penske intentionally discriminated against LeVelle because its perception of him as disabled was a motivating factor in its decision to discharge him.

The jury awarded LeVelle compensatory damages in the amount of $10,000.00, back-pay in the amount of $28,500.00, and punitive damages in the amount of $50,000.00. LeVelle filed a Motion for Attorney's Fees and Costs,

seeking fees in the amount of $111,949.50, an enhancement totaling $32,628.84, and $2533.74 in costs. Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, Penske moved the court to grant judgment as a matter of law or, in the alternative, grant a new trial or amend the verdict. It also opposed in part LeVelle's motion for fees and costs. The district court denied Penske's Rule 50/Rule59 motion, and awarded LeVelle $111,949.50 in fees and $2533.74 in costs. Penske appeals from the district court's denial of its post-trial motion. It also appeals the district court's award of attorneys' fees and costs.

## III. Analysis

### A. LeVelle's "Regarded As" Disabled Claim

Penske contends the district court erred in denying its motion for judgment as a matter or law or for a new trial on the merits of LeVelle's ADA claim. This court reviews *de novo* a district court's denial of a motion for judgment as a matter of law. *Kelly v. Metallics W., Inc.*, 410 F.3d 670, 674 (10th Cir. 2005). Judgment as a matter of law is "only proper when the evidence and all reasonable inferences to be drawn therefrom are so clear that reasonable minds could not differ on the conclusion." *Id*. (quotation omitted). In other words, a court may grant a motion for judgment as a matter of law "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1131 (10th Cir. 2005) (quotations omitted). In reviewing a district court's denial

-9-

of a motion for a judgment as a matter of law, "[w]e review all the evidence in the record, construing it and any inferences therefrom in favor of the non-moving party, and refraining from making credibility determinations and weighing evidence." *Id.* We review a district court's denial of a motion for a new trial for abuse of discretion, viewing all the evidence in the light most favorable to the prevailing party. *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1156 (10th Cir. 2006). "[E]ven if we do not necessarily agree with the jury's verdict, it must be upheld unless it is clearly, decidedly or overwhelmingly against the weight of the evidence." *Id.* at 1157 (quotation omitted).

"The ADA prohibits discrimination by covered entities, including private employers, against qualified individuals with a disability." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 477 (1999). Under the ADA, a person with a disability is defined, among other things, as an individual who is "regarded as having . . . an impairment" which "substantially limits one or more of the major life activities of such individual."[2] 42 U.S.C. § 12102(2). "[T]o establish a disability under the 'regarded as' prong of the ADA with respect to the major life activity of working, an individual must show [his] employer regarded him . . . as being substantially

---

[2]The Supreme Court has observed an employee may fall within the "regarded as" prong of the ADA's definition in two ways: his employer can believe he has a substantially limiting impairment that he does not actually have, or his employer can believe his actual impairment is substantially limiting when his impairment is not, in fact, substantially limiting. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).

-10-

limited in performing either a class of jobs or a broad range of jobs in various classes." *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1256 (10th Cir. 2001) (quotation omitted). The employee also must show his employer's misperceptions were based on myths, fears, or stereotypes associated with disabilities. *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1133 (10th Cir. 2003).

Penske contends the jury's verdict on LeVelle's ADA claim cannot stand because LeVelle presented no evidence it regarded him as unable to perform a class of jobs or a broad range of jobs in various classes. Penske also asserts LeVelle failed to present evidence to show its actions were based on speculation, myth, or stereotype. Upon review of the record as a whole, we cannot agree with Penske's argument.

### *(1) Regarded As Unable to Perform a Broad Range of Jobs*

LeVelle presented evidence susceptible to reasonable inferences supporting his position that Penske viewed him as unable to perform a broad variety of jobs. According to Ward's testimony, after she determined LeVelle could not work as a driver, she did not consider him for any other positions with Penske because of his restrictions. Ward told the jury there was a vacant transportation clerk position at Penske at the time LeVelle was terminated, and she defined the vacant job as a clerical position that did not involve heavy physical work. Although Ward noted she lacked approval to have the transportation clerk position filled at that time, she conceded she did not consider LeVelle for the job and admitted she

received approval to fill the position shortly after LeVelle was terminated. The foregoing evidence is susceptible to the reasonable inference Penske did not consider LeVelle for the transportation clerk position because of his medical restrictions.

After learning Penske would not allow him to continue working as a driver delivering and installing appliances, LeVelle inquired of the manager of another Penske division about getting a job delivering cabinets on a route that was largely "retail." LeVelle testified the retail route would have involved delivering cabinets from one loading dock to another, and would not have required him to install the cabinets. Although the cabinet delivery position would have required LeVelle to move boxes weighing up to 300 pounds without a helper, LeVelle told the jury he was physically capable of the job. LeVelle explained that by sliding a dolly under an appliance, tilting it to a balanced position, and rolling the appliance on the dolly, he could singlehandedly move heavy appliances without lifting them. LeVelle told the jury he believed he did not exceed his doctor-recommended restrictions when he used the dolly in this fashion. Penske's human resources department, however, did not allow LeVelle to be hired for the cabinet delivery position. A jury could reasonably infer from LeVelle's testimony that the cabinet delivery position was not as physically demanding as the driver position, that LeVelle could have performed the job without violating his medical

-12-

restrictions, and that Penske nonetheless refused to consider LeVelle for the position.

Upon terminating LeVelle, Penske gave him a letter stating he was laid off because no work was available, not because he was subject to medical restrictions. Cooley, the Penske human resources department employee, told LeVelle he would be better off with the "no work available" letter and explained a letter revealing the existence of LeVelle's restrictions to potential future employers would interfere with LeVelle's ability to get another job. A jury could reasonably infer from this testimony that Cooley believed disclosure of LeVelle's restrictions would interfere with LeVelle's ability to get any other job, not just another job involving heavy physical labor.

In short, evidence presented at trial permits the reasonable inference Penske regarded LeVelle as being unable to perform a wide range of jobs. Therefore, a jury could reasonably conclude Penske viewed LeVelle unable to perform a class of jobs or a broad range of jobs in various classes.

*(2) Action Based on Myths, Fears, or Stereotypes*

The evidence presented at trial also permits the conclusion that Penske's actions were based upon myths, fears, or stereotypes about LeVelle's perceived disability, not upon his actual ability to work. Penske argues it acted reasonably, basing its actions solely on the lifting, pulling, and pushing restrictions recommended by LeVelle's physicians. As discussed above, however, LeVelle

presented evidence sufficient to permit the inference Penske refused to consider LeVelle for jobs even when LeVelle's doctor-recommended restrictions would not have precluded him from performing those jobs. Based on this evidence, a jury could reasonably infer Penske's actions were based upon myths, fears, or stereotypes about LeVelle's perceived disability rather than an objective evaluation of LeVelle's actual abilities.

*(3) Summary*

After considering the record as a whole and drawing all reasonable inferences in favor of LeVelle, we conclude a jury could reasonably infer Penske considered LeVelle unable to perform a class of jobs or a broad range of jobs in various classes, and Penske based its actions on myths, fears, or stereotypes instead of on LeVelle's actual abilities. The evidence presented at trial was therefore sufficient to permit the conclusion that Penske regarded LeVelle as disabled for purposes of the ADA. Accordingly, Penske is not entitled to judgment as a matter of law. For the same reasons, we conclude the district court did not abuse its discretion when it denied Penske's motion for a new trial.

*B. Award of Punitive Damages*

Penske contends the district court erred in denying its motion for judgment as a matter of law or for a new trial on the issue of punitive damages. It claims there is no evidence to support the jury's award of punitive damages. This court

reviews *de novo* whether there exists sufficient evidence to support an award of punitive damages. *Dilley v. SuperValu, Inc.*, 296 F.3d 958, 966 (10th Cir. 2002).

A court may award punitive damages to an ADA plaintiff when the plaintiff demonstrates the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1); *see also EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1244 (10th Cir. 1999). A plaintiff seeking to meet this standard need not show "egregious or outrageous discrimination independent of the employer's state of mind." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). He must, however, demonstrate the employer "at least discriminate[d] in the face of a perceived risk that its actions w[ould] violate federal law." *Id*. at 536. To demonstrate he is entitled to punitive damages, a plaintiff must meet a higher standard than that required to show he is entitled to compensatory damages. *Id*. at 534. For that reason, "[t]here will be circumstances where intentional discrimination does not give rise to punitive damages liability." *Id*. at 536.

LeVelle argues a jury could conclude Penske knew it was violating his rights under the ADA because Cooley, who worked in Penske's human resources department, participated in LeVelle's termination. LeVelle argues a jury could infer that as a human resources employee, Cooley knew federal disability law and thus was aware Penske's decision to terminate LeVelle might violate the ADA.

-15-

As LeVelle points out, this court has determined a jury could conclude an employer discriminated in the face of a perceived risk that its action would violate federal law when the discriminating employer's agent testified he was familiar with the ADA's requirements when he suspended a disabled employee. *Wal-Mart Stores*, 187 F.3d at 1246. In the instant case, however, LeVelle did not call Cooley as a witness, and the record is devoid of evidence indicating whether Cooley was familiar with the requirements of the ADA. Cooley's position in Penske's human resources department, standing alone, is not enough to support a reasonable inference Penske terminated LeVelle in the face of a perceived risk its actions would violate federal law.

LeVelle claims a number of other facts suggest Penske terminated him in the face of a perceived risk it was violating the ADA. For example, he contends Penske must have been aware its actions risked violating the ADA because Ward terminated him soon after she found out about his restrictions, without making any effort to seek updated medical information or perform an individualized assessment of his abilities. This evidence does not suggest Penske knew terminating LeVelle risked violating the ADA and therefore does not support LeVelle's claim to punitive damages. LeVelle also argues Penske must have known terminating him risked violating the law because Ward and Cooley gave him a letter containing a false explanation for his termination. As noted above, LeVelle presented no evidence to suggest Cooley was familiar with the

-16-

requirements of the ADA. Similarly, Ward gave unrebutted testimony that she had never received training in ADA compliance. Without any evidence to suggest Cooley or Ward was familiar with the requirements of the ADA, the termination letter they gave to LeVelle, standing alone, does not permit the reasonable inference that Penske knew its actions risked violating the law. Finally, LeVelle asserts Penske's conduct in terminating him evidenced malicious disregard of his federal rights. The record does not substantiate LeVelle's claim, and we find LeVelle's argument unpersuasive.

After reviewing the record on appeal, we conclude LeVelle failed to present evidence that would allow a jury to find Penske discriminated in the face of a perceived risk its conduct would violate the ADA. Accordingly, the district court erred when it denied Penske's motion for judgment as a matter of law on the issue of punitive damages.

### C. Award of Attorneys' Fees

Penske contends the district court's award of attorneys' fees to LeVelle was excessive and must be substantially reduced. This court reviews a district court's award of attorneys' fees for abuse of discretion, although the "legal analysis underpinning the fee award is reviewed de novo." *Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1257 (10th Cir. 2005). We conduct our review with knowledge that "[t]he district court has an inherent advantage in passing on a fee request given its familiarity with the proceedings below." *Id*. "Unless district courts are

specific in their reasons for awarding attorneys' fees," however, "we have no adequate basis upon which to review such awards." *Wolfe ex. rel Joseph A. v. N.M. Dep't of Human Servs.*, 28 F.3d 1056, 1061 (10th Cir. 1994).

"A party who prevails on an ADA claim is permitted recovery of attorneys' fees, costs and expenses." *Praseuth*, 406 F.3d at 1257. As the prevailing party, LeVelle requested attorneys' fees in the amount of $111,949.50 and an enhancement in the amount of $32,628.84. Penske conceded LeVelle was entitled to attorneys' fees, but argued the court should award him less than the amount he requested. It argued LeVelle was not entitled to the full amount he claimed because, *inter alia*, LeVelle did not prevail on his race discrimination and wrongful discharge claims, he did not need two attorneys at trial, certain of his expenditures were excessive, and he was not entitled to any enhancement of fees.

The district court awarded LeVelle attorneys' fees in the amount of $111,949.50, which was the exact lodestar amount presented by LeVelle. In making its award, however, the district court indicated it reduced the lodestar and added an enhancement in arriving at $111,949.50. The court stated its award was

> based in part on an offset between a reduction in fees for limited inefficiencies, some vague billing entries and the lack of success on two of the plaintiff's claims balanced against a limited enhancement of allowable fees that is justified here. Implicit in the award is the reasonableness of the hourly rates sought by plaintiff's counsel.

*LeVelle v. Penske Logistics*, No. 02-F-2220 (D. Colo. April 18, 2005) (Orders On Post-Trial Motions).

On appeal, Penske claims the district court abused its discretion by awarding excessive attorneys' fees. Without a more particularized explanation of the reductions and enhancements found by the district court, however, we cannot determine whether the district court abused its discretion. *See, e.g.*, *Bartlett v. Martin Marietta Operations Support, Inc. Life Ins. Plan*, 38 F.3d 514, 519 (10th Cir. 1994) (concluding the district court did not sufficiently explain its award of attorney's fees). This court therefore remands the district court's order on attorneys' fees for more detailed findings. LeVelle's motion for leave to file a sur-reply is **granted**.

## IV. Conclusion

For the foregoing reasons, this court **affirms** the district court's denial of Penske's post-trial motion in part, **vacates** the district court's award of punitive damages, and **remands** for further proceedings not inconsistent with this opinion.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge