**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 20, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ABIGAIL ROSS,

     Plaintiff - Appellant,

v.

UNIVERSITY OF TULSA,

     Defendant - Appellee.
_____

EQUAL RIGHTS ADVOCATES;
SURVJUSTICE INC.,

     Amici Curiae.

No. 16-5053

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:14-CV-00484-TCK-PJC)**
_____

John Clune, Hutchinson Black and Cook, LLC, Boulder, Colorado (Lauren
E. Groth, Hutchinson Black and Cook, LLC, Boulder, Colorado, J. Spencer
Bryan, and Steven J. Terrill, Bryan & Terrill Law, PLLC, Tulsa,
Oklahoma, with him on the briefs), for Plaintiff-Appellant Abigail Ross.

John David Lackey, Paul & Lackey, P.C., Tulsa, Oklahoma, for Defendant-
Appellee University of Tulsa.

Rebecca Peterson-Fisher, Equal Rights Advocates, San Francisco,
California, filed a brief for Amici Curiae Equal Rights Advocates and
SurvJustice Inc.
_____

Before **KELLY**, **EBEL**, and **BACHARACH**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

The plaintiff (Ms. Abigail Ross) was allegedly raped by a fellow student at the University of Tulsa (Mr. Patrick Swilling). The alleged rape led Ms. Ross to sue the university for money damages under Title IX of the Education Amendments Act of 1972. Under Title IX, universities that receive federal financial assistance cannot discriminate on the basis of gender. *See* 20 U.S.C. § 1681(a). Such discrimination occurs when a university obtains notice of sexual harassment and responds with deliberate indifference. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

In this case, Ms. Ross presents distinct theories of the university's deliberate indifference.

The first theory involves what happened before the alleged rape: that the university acted with deliberate indifference by failing in 2012 to adequately investigate reports that Mr. Swilling had raped another student (J.M.).

The second theory involves what happened after the alleged rape of Ms. Ross. After Ms. Ross reported the rape, the university conducted a student-conduct hearing. The purpose was to determine whether Mr. Swilling had violated university policy by raping Ms. Ross. By the time of

the hearing, university officials had learned of prior reports of sexual harassment committed by Mr. Swilling. But these reports were excluded at the hearing. Ms. Ross alleges that exclusion of these reports constituted deliberate indifference on the part of the university.

The University of Tulsa obtained summary judgment on both theories, and Ms. Ross appeals. On the first theory, the dispositive issue is whether a fact-finder could reasonably infer that an appropriate person at the university had actual notice of a substantial danger to others. On the second theory, we must determine whether a reasonable fact-finder could characterize exclusion of the prior reports as deliberate indifference.

We conclude that both theories fail as a matter of law. On the first theory, campus-security officers were the only university employees who knew about reports that J.M. had been raped. Based on Ms. Ross's arguments, a reasonable fact-finder could not infer that campus-security officers were appropriate persons for purposes of Title IX. And on the second theory, there is no evidence of deliberate indifference by the University of Tulsa. The university excluded prior reports of sexual harassment based on a reasonable application of university policy. Thus, we affirm the award of summary judgment to the university.

## I.    Standard of Review

In considering the award of summary judgment, we engage in de novo review. *Koch v. City of Del City*, 660 F.3d 1228, 1237 (10th Cir.

3

2011). This review requires us to view the summary-judgment evidence in the light most favorable to Ms. Ross, resolving all factual disputes and drawing all reasonable inferences in her favor. *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). Summary judgment is appropriate only if the University of Tulsa shows that (1) there are no genuine issues of material fact and (2) the University of Tulsa is entitled to judgment as a matter of law. *Koch*, 660 F.3d at 1238.

## II. The Elements of Ms. Ross's Claim

For both theories, Ms. Ross must satisfy four elements:

1. The University of Tulsa had actual notice of a substantial risk that Mr. Swilling would commit an act of sexual harassment (such as sexual violence) against a student.

2. The University of Tulsa was deliberately indifferent to that risk.

3. The sexual harassment was severe, pervasive, and objectively offensive.

4. The sexual harassment deprived Ms. Ross of access to the university's educational benefits or opportunities.

*See Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999). The University of Tulsa challenges only the first and second elements.

On the first element, the University of Tulsa could obtain notice only through an appropriate person. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). An appropriate person "is, at a minimum, an official

4

of the [university] with authority to take corrective action [on behalf of the university] to end the discrimination." *Id*.

On the second element, a university is "deemed 'deliberately indifferent' to acts of student-on-student harassment only where the [university's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).

## III. Ms. Ross's First Theory (Prior to the Alleged Rape of Ms. Ross)

Ms. Ross's first theory involves what happened before her alleged rape: According to Ms. Ross, the University of Tulsa failed to adequately investigate two reports in 2012 that Mr. Swilling had raped J.M.[1] For this theory, Ms. Ross points to evidence that in 2012, two football players had reported a rape of J.M. to campus security and J.M. then confirmed the rape. But at J.M.'s behest, campus-security officers dropped the matter. Ms. Ross contends that dropping the matter left Mr. Swilling free to sexually assault others at the university.

---

[1]    Courts are split on whether notice can consist of prior reports. *See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008); *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1153 (10th Cir. 2006). But we need not weigh in on this split, as the university does not deny that notice can theoretically consist of prior reports of sexual harassment. For the sake of argument, we assume that prior reports can be sufficient. Even with that assumption, Ms. Ross's first theory would fail as a matter of law.

Like the district court, we reject this theory as a matter of law. But our reasoning differs from the district court's.

In the district court's view, a fact-finder could reasonably conclude that two high-ranking campus-security officers were appropriate persons. But the district court held that (1) J.M.'s report was too vague to provide notice and (2) even if J.M.'s report had provided such notice, the University of Tulsa's response would not have been clearly unreasonable. To support the second holding, the district court observed that

- J.M. had declined to press criminal charges against Mr. Swilling or file a student-conduct complaint and

- J.M. had indicated that she did not want disruption in her life prior to her upcoming graduation.

Thus, the court reasoned, it was not clearly unreasonable for the university to drop the matter.

We take a different view. Viewing the evidence in the light most favorable to Ms. Ross, a fact-finder could justifiably infer that campus-security officers had learned of the reported rape. That knowledge could reasonably suggest that dropping the investigation was clearly unreasonable, leaving a potential predator free to sexually assault others at the university. But based on Ms. Ross's arguments, a reasonable fact-finder could not conclude that the campus-security officers had authority to take corrective action. In the absence of such authority, Ms. Ross's first theory fails as a matter of law.

6

**A.** **The reports by the football players and J.M. could have provided campus-security officers with actual notice.**

The threshold inquiry is whether the campus-security officers obtained actual notice in 2012 of a substantial risk to individuals on campus. In our view, a reasonable fact-finder could infer such notice.

"'[A]ctual notice requires more than a simple report of inappropriate conduct . . . .'" *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006) (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 63 (D. Me. 1999)). Here, however, the reports provided far more. In our view, these reports could have led a fact-finder to reasonably infer actual notice on the part of campus-security officials.

**1.** **A reasonable fact-finder could infer that J.M. had characterized her sexual encounter as a rape.**

In 2012, two football players called campus security and reported that their friend, J.M., had been raped in her campus apartment by Mr. Swilling. The football players explained that they had learned of the rape from J.M.'s roommate. According to the football players, the roommate had overheard the rape.

Following this report, J.M. spoke with campus-security officers. The parties disagree over what J.M. shared with campus security. According to Ms. Ross, J.M. confirmed that she had been raped the prior night; according to the University of Tulsa, J.M. stated that the sexual encounter

7

had been consensual. Ms. Ross's position is supported by at least three evidentiary items.

The first is a recorded conversation in 2014 between J.M. and a campus-security officer, Sergeant Zach Livingston. During this conversation, J.M. acknowledged that (1) Mr. Swilling had sexually assaulted her in 2012 and (2) she had reported the assault shortly thereafter to campus-security officers. The conversation included this exchange:

> Sergeant Livingston: I'm just trying to figure out because when, you know, everything that we've discovered about it has said that when you came in that you said it was a consensual deal.
>
> J.M.: No.

Appellant's App'x, vol. V at 1201, 3:16-3:28 (Plaintiff's Response to Defendant's Partial Motion for Summary Judgment, Exhibit 12).[2]

The second evidentiary item is a recorded conversation between J.M. and an investigator from the Tulsa County District Attorney's Office. During this conversation, J.M. said that in 2012, she had told campus-security officers: "Patrick [Swilling] had taken advantage of me," "it was not with my . . . acknowledgement," and "I just don't want to even think

---

[2]    The record of this interview, like others cited in this opinion, is available only as an audio recording. Our citations for the audio recordings provide the page numbers where the recordings are indexed and the time stamps of the relevant material. The parentheticals provide the titles of the exhibits as given in the table of contents to the appendix.

8

about it anymore." Appellant's App'x, vol. V at 1202, 39:02-39:47 (Plaintiff's Response to Defendant's Partial Motion for Summary Judgment, Exhibit 13). J.M. also indicated that she had explained her preference not to pursue the matter with Mr. Swilling because

- she had only one semester remaining before graduation,

- she did not want her private life to be publicized, and

- Mr. Swilling's father was a powerful figure who had played professional football.

J.M. added that the campus-security officers had agreed that Mr. Swilling's father was a prominent figure.

The third evidentiary item is a recorded conversation between a former campus-security officer and a Tulsa police detective. The detective stated: "[T]he other thing was that [J.M.] said that you guys knew . . . that . . . when she filled out [a written report] that . . . she put in there that she was raped." Appellant's App'x, vol. V at 1203, 13:43-13:54 (Plaintiff's Response to Defendant's Partial Motion for Summary Judgment, Exhibit 14).[3]

---

[3]     Some summary-judgment evidence indicates that campus-security officers destroyed J.M.'s written statement. In light of this potential destruction of evidence, Ms. Ross argues that "it was inappropriate for the district court to have credited [the University of Tulsa] with [J.M.]'s report being too 'vague' to require further action when the precise content of that complaint is no longer available due to [the University of Tulsa's] own destruction." Appellant's Opening Br. at 34. We need not address this

9

The University of Tulsa points to contrary accounts from current and former campus-security officers. According to these accounts, J.M. reported in 2012 that the sexual activity had been consensual. Although a fact-finder could reasonably credit these accounts, we must resolve this factual dispute favorably to Ms. Ross. *See* Part I, above. Doing so, we conclude that a fact-finder could reasonably determine that J.M. had told campus security in 2012 that she was raped by Mr. Swilling.

### 2. The fact-finder could reasonably infer that the reports by J.M. and the football players had been sufficiently specific to supply actual notice.

In our view, the fact-finder could justifiably infer that (1) J.M.'s report was sufficiently detailed and (2) the reports by the football players added specificity to J.M.'s report. The district court reached a different conclusion, concluding for four reasons that J.M.'s report was too vague to provide actual notice. We disagree with the court's reasoning.

First, the district court noted that J.M. had been reluctant to speak with campus security in 2012. But J.M.'s reluctance need not mean that her report was vague.

Second, the district court noted that J.M. had not used the words "rape" or "assault" when talking to campus-security officers. This observation is immaterial, for J.M. denied telling campus-security officers

argument because the district court's vagueness analysis was otherwise flawed. *See* Part III(A)(2), below.

10

that the sexual encounter had been consensual. *See* Part III(A)(1), above. Thus, a fact-finder could justifiably conclude that J.M. had described a rape. *See Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 132, 136-37 (2d Cir. 2001) (accepting for purposes of summary judgment that a woman had reported a rape to her employer even though the woman had not used the word "rape"). In addition, the football players added clarity, stating that J.M. had been raped by Mr. Swilling.

Third, the district court stated that J.M. had not provided campus security with "facts or details." *Ross v. Univ. of Tulsa*, 180 F. Supp. 3d 951, 968 (N.D. Okla. 2016). But, from the reports by J.M. and the football players, the campus-security officers could ascertain "the basic facts, the who, what, when, and where." *See United States v. Fusaro*, 708 F.2d 17, 25 (1st Cir. 1983). For example, a fact-finder could justifiably conclude that the campus-security officers had known

- who was reportedly involved (J.M. and Mr. Swilling),

- what reportedly happened (Mr. Swilling raped J.M.),

- when the rape reportedly occurred (the prior evening), and

- where the rape reportedly occurred (in J.M.'s campus apartment).

A fact-finder could justifiably conclude that these basic facts provided campus-security officers with actual notice.

11

The University of Tulsa appears to argue that greater specificity is required when the alleged harasser was a student rather than a teacher. But, even if this were true, the reports here were sufficiently specific to provide actual notice to the university.

Fourth, the district court asserted that J.M. had not accused Mr. Swilling of any specific misconduct. But, as discussed above, a fact-finder could justifiably conclude that J.M. had reported a rape. *See* Part III(A)(1), above.[4]

Rejecting the district court's four rationales, we conclude that the fact-finder could reasonably view the reports by J.M. and the football players as sufficiently specific to constitute actual notice to campus-security officers.

\* \* \*

A fact-finder could reasonably conclude that J.M. had reported a rape in 2012. Of course, the fact-finder might also reach the opposite conclusion. But at this stage of the proceedings, we must resolve this factual dispute favorably to Ms. Ross. *See* Part I, above. Based on the

---

[4] The two amici curiae argue that the district court's analysis is also flawed because under § 1983, "an official cannot escape a finding of deliberate indifference where the evidence shows that he 'refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" Amici Br. at 14 (quoting *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005)). Because we have elsewhere determined that the district court's analysis was erroneous for other reasons, we need not address the amici's argument.

reports by J.M. and the football players, the fact-finder could justifiably conclude that campus-security officers had actual notice of a substantial danger posed by Mr. Swilling's presence at the university.[5]

## B. The fact-finder could justifiably conclude that campus-security officers had acted with deliberate indifference.

A university is "deemed 'deliberately indifferent' to acts of student-on-student harassment only where the [university's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). The resulting issue is whether a fact-finder

---

[5]  In discussing the existence of actual notice, the University of Tulsa apparently contends that the university lacked substantial control over the context for the alleged rapes of J.M. and Ms. Ross.

The apparent contention about J.M.'s rape appears irrelevant because J.M. has not sued.

For the alleged rape of Ms. Ross, the university could incur liability only by exercising "substantial control over . . . the context in which the [alleged rape] occur[red]." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999). Ms. Ross's alleged rape occurred in a private apartment on campus.

The fact-finder could reasonably infer university control over a rape in the apartment. For example, the summary-judgment evidence indicates that the university exerts disciplinary authority over students for misconduct that occurs in private apartments on campus. In addition, if Mr. Swilling had been found responsible in 2012 for raping J.M., the university could have expelled him and barred him from the campus. By barring Mr. Swilling from the campus, the university could potentially have prevented him from sexually harassing students on campus. In these circumstances, a fact-finder could reasonably conclude that the university had retained substantial control over the context for Ms. Ross's alleged rape.

13

could justifiably conclude that campus-security officers had acted in a clearly unreasonable manner.

Viewing the summary-judgment evidence in the light most favorable to Ms. Ross, the fact-finder could reasonably conclude that campus-security officers had acted in a clearly unreasonable manner when dropping the investigation. Thus, the fact-finder could reasonably conclude that campus-security officers had been deliberately indifferent.

Ms. Ross does not dispute that in 2012, J.M.

- declined to press criminal charges against Mr. Swilling or to file a student-conduct complaint and

- indicated that she did not want disruption in her life prior to graduation.

The district court focused on these facts, reasoning that further investigation of Mr. Swilling would have disrupted J.M.'s life. Thus, the district court concluded that campus-security officers had not acted with deliberate indifference when dropping the investigation.

But the fact-finder could reasonably conclude that campus-security officers had known that further investigation was necessary to gauge the significance of Mr. Swilling's danger to others. One campus-security officer acknowledged that investigation is necessary to avert a threat to other students regardless of whether an alleged victim has chosen to cooperate:

14

Q.  Okay. Why would you retain or even begin an investigation when the alleged victim doesn't appear to want to make a report?

A.  Whether or not the victim was interested in making a report or not, it was still a reportable offense. And the university had a duty to investigate and determine if that offense had been committed and report accordingly if it was found that it had been, with or without the victim cooperation.

Q.  You would agree that merely because somebody does not want to report something, doesn't mean the alleged perpetrator is not still a threat to other students?

A.  Correct. Most generally failure of victim cooperation is likely in sexual related offenses. And it could be for a number of -- you know, fear, embarrassment or other reasons for them not to cooperate. However, as a law enforcement officer there is still a duty to investigate the crime.

Appellant's App'x, vol. VI at 1222-23. Similarly, guidance from the Office for Civil Rights states that universities should investigate even when an alleged victim fails to report sexual harassment or to cooperate in the investigation:

> Once a school has notice of possible sexual harassment of students . . . it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again. These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action.

Office for Civil Rights Guidance at 15. Perhaps for this reason, University of Tulsa Dean Yolanda Taylor acknowledged that the university would

15

have incurred an obligation to investigate even if the complaining individual had declined to participate. In these circumstances, a fact-finder could justifiably conclude that

- the presence of a rapist on the university campus would pose a substantial risk to others and

- campus-security officers had acted in a clearly unreasonable manner when dropping the investigation.[6]

But this does not mean that we can impute deliberate indifference to the university itself. Until Ms. Ross reported the rape, the only university employees that knew of J.M.'s alleged rape were campus-security officers. The resulting issue is whether these officers were appropriate persons under Title IX.

**C.    Based on Ms. Ross's arguments, a reasonable fact-finder could not conclude that the University of Tulsa's campus-security officers were appropriate persons.**

To trigger Title IX liability, a university must have actual notice through an appropriate person. *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1152 (10th Cir. 2006). An appropriate person "is, at a minimum, an official of the [university] with authority to take corrective action [on behalf of the

---

[6]    Ms. Ross and the amici also present other arguments, contending that the university acted with deliberate indifference in (1) failing to provide J.M. with all necessary information and accommodations and (2) disregarding the university's own policies, past practices, and legal obligations. We need not address these arguments.

university] to end the discrimination." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *see* Part II, above.

A fact-finder could reasonably conclude that campus-security officers had learned in 2012 that J.M. was complaining of a rape rather than describing a consensual sexual encounter. But there is nothing to suggest that this information went beyond campus-security officers. Therefore, we must consider whether Ms. Ross's arguments could reasonably support characterization of campus-security officers as appropriate persons.

In district court, Ms. Ross argued that all campus-security officers were appropriate persons. The district court did not go this far. Instead, the court concluded only that a reasonable fact-finder could regard two high-ranking campus-security officers as appropriate persons: Security Director Joe Timmons and Patrol Captain Paul Downe. For this conclusion, the district court gave three reasons. On appeal, Ms. Ross defends the district court's conclusion and argues that the court's reasoning would support characterization of all campus-security officers as appropriate persons.

In our view, Ms. Ross has not justified treatment of all campus-security officers as appropriate persons. Thus, Ms. Ross cannot avoid summary judgment on her theory regarding the university's response to the reports by the football players and J.M.

17

### 1.    The District Court's First Reason

The district court's first reason was that the University of Tulsa had designated campus security as a proper recipient of sexual-harassment reports. Based on this designation, the district court compared the role of campus-security officers to the role that teachers had in *Montgomery v. Independent School District No. 709*, 109 F. Supp. 2d 1081 (D. Minn. 2000). The *Montgomery* court explained that

> the School District's sexual harassment policy imposes upon teachers a duty to convey reports of sexual harassment to the school principals. It is therefore clear that teachers had the authority to take at least this minimal corrective measure which, if effectively carried out, would impart knowledge of the harassment to higher School District officials with even greater authority to act.

*Id.* at 1099. Factually, our case bears some resemblance to *Montgomery*. Legally, however, the Supreme Court in *Gebser* has rejected use of vicarious liability and agency principles as grounds for liability under Title IX. In our view, *Gebser* requires us to reject the district court's first reason.

Analogizing her circumstances to those in *Montgomery*, Ms. Ross notes that university policy required campus-security officers to automatically report sexual assaults to the Office of Student Affairs. For this argument, Ms. Ross interprets the Supreme Court's opinion in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998). There the Supreme Court explained that an appropriate person "is, at a minimum, an

18

official of the [university] with authority to take corrective action [on behalf of the university] to end the discrimination." 524 U.S. at 290; *see* Parts II, III(C), above. In Ms. Ross's view, campus security's role in receiving and forwarding complaints means that campus-security officers "institute corrective measures" for the University of Tulsa. *Gebser*, 524 U.S. at 290. Essentially, Ms. Ross reads *Gebser* as holding that anyone who participates in the initiation of a corrective process is an "appropriate person."

The district court's reasoning and Ms. Ross's argument would stretch the Supreme Court's opinion in *Gebser*. *Gebser* provides that if campus-security officers cannot themselves take corrective action, they would not be considered appropriate persons. *See* Part II, above. And merely passing on a report of sexual harassment to someone authorized to take corrective action is not itself corrective action. *See Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 459 (8th Cir. 2009) (holding that specified school personnel are authorized to report potentially discriminatory conduct, "[b]ut that authority does not amount to an authority to take a corrective measure or institute remedial action within the meaning of Title IX"); *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660-61 (5th Cir. 1997) (indicating that notice of harassment by employees who lack authority, beyond reporting the misconduct to other employees, is insufficient to trigger a school's liability under Title IX).

19

To decide otherwise would turn the deliberate-indifference standard into vicarious liability. For example, consider a school where every employee receiving a report of sexual harassment must convey the report to the principal. If one employee fails to convey a report to the principal, that failure could be attributed to the school as a whole. This type of vicarious liability is precisely what the Supreme Court sought to avoid through the deliberate-indifference standard. *See Gebser*, 524 U.S. at 287-90 (rejecting the application of vicarious liability and agency principles as grounds for triggering liability under Title IX); *see also Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999) (stating that in *Gebser*, the Supreme Court "rejected the use of agency principles to impute liability to the district for the misconduct of its teachers").

Ms. Ross's contrary interpretation of *Gebser* would create Title IX liability for clerical errors by ministerial personnel who lack any discretionary authority to take corrective measures. For example, consider the assistant for a Dean of Students who is tasked with adjudicating student-conduct complaints. Under Ms. Ross's interpretation, this assistant would be considered an appropriate person simply for receiving and forwarding reports to the Dean of Students. The clerical act of receiving and forwarding a report may ultimately lead the Dean of Students to take corrective action, but is not itself corrective action. Nothing in *Gebser* would suggest liability for a university based solely on the assistant's loss

20

of a report or failure to forward it to the Dean of Students. *See*, *e.g.*, *Hill v. Cundiff*, 797 F.3d 948, 971 (11th Cir. 2015) (holding that a teacher's aide was not an "appropriate person" for purposes of Title IX).

Under *Gebser*, we reject the district court's first reason for treating campus-security officers as appropriate persons.

### 2. The District Court's Second Reason

The district court's second reason focused on campus security's investigative role. For example, the district court observed that campus-security officers "work[] directly with [the Office of Student Affairs] to investigate . . . instances of campus violence . . . ." *Ross v. Univ. of Tulsa*, 180 F. Supp. 3d 951, 967 (N.D. Okla. 2016).[7] On appeal, Ms. Ross similarly asserts that campus-security officers' investigative role makes the officers appropriate persons for purposes of Title IX.

It is not clear what Ms. Ross is arguing. She might be arguing that campus-security officers are appropriate persons because investigations are

---

[7]    The district court also stated that campus security works with the Office of Student Affairs to "combat campus violence and properly report instances of campus violence to the federal government." *Ross*, 180 F. Supp. 3d at 967. But aside from conducting investigations, Ms. Ross has not

- explained how campus-security officers combat campus violence or

- argued that reporting instances of campus violence to the federal government would constitute corrective action.

21

necessary for the university to start its corrective process. This potential argument would assume that anyone participating in the initiation of a corrective process is an "appropriate person." But this assumption would entail the sort of vicarious liability that the Supreme Court tried to avoid in *Gebser*. *See* Part III(C)(1), above.

If Ms. Ross is instead characterizing the investigation itself as a form of corrective action, the argument would also fail. Perhaps investigation is a form of corrective action; perhaps not. The answer is not self-evident and we need not resolve this question today, for Ms. Ross has not explained or supported characterization of an investigation as a form of corrective action. To the extent that she is taking this position, her argument is perfunctory and therefore waived. *See Hill v. Kemp*, 478 F.3d 1236, 1255 n.21 (10th Cir. 2007) (declining to consider an argument raised in a "perfunctory manner"). We therefore reject the district court's second reason for treating campus-security officers as appropriate persons.

### 3.     The District Court's Third Reason

The district court's third reason involved the university's designation of campus-security officers as appropriate persons. The court reasoned that this designation created an expectation among students:

> Third, [the university's] Sexual Violence Policy and other surrounding facts could be viewed as creating an equitable expectation in students (and their parents) that a report to [the university's campus-security officers] triggers any and all of [the university's] "corrective processes." Adopting [the

22

university's] argument would allow it to designate [the university's campus-security officers] as an entity to receive sexual violence complaints in its own Title IX policies, fail to ensure that such entity delivers reports to the school's Title IX coordinators, and effectively shield itself from Title IX civil liability. The Court does not read *Gebser* to require this result. Therefore, a jury could find the 2012 Report to [the university's campus-security officers] was made to an "appropriate person."

*Ross v. Univ. of Tulsa*, 180 F. Supp. 3d 951, 967 (N.D. Okla. 2016). In her

reply brief, Ms. Ross supports this rationale:

As is clear, the district court recognized that it would circumvent the purpose of Title IX if [the university] were permitted to designate its law enforcement officers as appropriate persons in its own Title IX policies, then avoid liability by merely suggesting otherwise in summary judgment briefing. This would render Title IX law on "appropriate person" utterly meaningless. Accordingly, the district court's ruling on this issue should be affirmed. [8]

Appellant's Reply Br. at 13.

_____

[8] In her reply brief, Ms. Ross alleged that "Dean [of Students Yolanda] Taylor [has] explained that a report to [campus security] is the equivalent of a report to the Title IX coordinator." Appellant's Reply Br. at 12 (citing Appellant's App'x, vol. V at 984). But the cited material—a deposition of Dean Taylor—does not support this allegation. In this deposition, Ms. Taylor was asked to "list out the different people that might interact with somebody who has reported sexual violence." Appellant's App'x, vol. V at 983. She complied by listing the Title IX coordinator and various deputy coordinators. Dean Taylor was then asked whether there was "[a]nybody else besides those coordinators and yourself? . . . What about campus security?" *Id.* at 948. She responded: "I'm sorry, and campus security of course." *Id.* Dean Taylor was simply stating that campus-security officers "might interact with somebody who has reported sexual violence." *See* Appellant's App'x, vol. V at 983-84. She was not characterizing a report to campus security as the equivalent of a report to the Title IX coordinator.

23

We reject this argument. To the extent that university policy indicates that campus-security officers would begin the university's "corrective processes," that fact would not justify treating the officers as appropriate persons for purposes of Title IX. *See* Part III(C)(1), above.

Ms. Ross adds that university policy designated campus security as "appropriate persons." But university policy does not expressly designate campus security as appropriate persons.

As a result, we reject the district court's third reason for treating campus-security officers as appropriate persons.

* * *

Ms. Ross's summary-judgment evidence indicates that campus-security officers learned in 2012 that J.M. was reporting a rape committed by Mr. Swilling. But Ms. Ross has not justified treatment of campus-security officers as appropriate persons for purposes of Title IX. Thus, Ms. Ross's first theory fails as a matter of law.[9]

---

[9] At oral argument, the panel asked the University of Tulsa (1) whether campus-security officers had the power to arrest and (2) if so, whether that power would make these officers appropriate persons. But Ms. Ross did not rely on the arrest power in district court or in her appellate briefs. Thus, we need not decide whether the possible power to arrest would make campus-security officers appropriate persons.

**IV.    Ms. Ross's Second Theory (After the Alleged Rape of Ms. Ross)**

Ms. Ross also presents a second theory: that the University of Tulsa responded to her report in a way that was clearly unreasonable. This theory is based on an evidentiary rule that the University of Tulsa allegedly uses for student-conduct hearings: Evidence of the student's prior misconduct may be considered only if there had been an earlier finding of responsibility. Ms. Ross alleges improper reliance on this rule to exclude evidence of Mr. Swilling's prior misconduct.[10]

**A.    The Absence of a Prior Finding of Responsibility**

When the university conducted the hearing on Ms. Ross's complaint, Mr. Swilling had not been found responsible for any acts of sexual harassment. As a result, the hearing officer did not consider reports of Mr. Swilling's other acts of sexual misconduct. In her opening brief, Ms. Ross attributed the absence of a finding of responsibility to the University of Tulsa's failure to properly investigate Mr. Swilling's past acts of sexual harassment. This theory fails as a matter of law.

---

[10]    At oral argument, Ms. Ross appeared to contend that this evidentiary rule had not been applied in the hearing. Instead, she contended that the university had imposed a blanket ban on all evidence of prior sexual history. This argument is waived because it was presented for the first time at oral argument. *See Lebahn v. Nat'l Farmers Union Uniform Pension Plan*, 828 F.3d 1180, 1188 n.8 (10th Cir. 2016) (stating that arguments made for the first time at oral argument are waived). Thus, we need not consider this contention.

25

Ms. Ross's theory is subject to the same deliberate-indifference standard set out in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*: A university is "deemed 'deliberately indifferent' to acts of student-on-student harassment only when the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." 526 U.S. 629, 648 (1999); *see* Part II, above.

As a threshold matter, it is not clearly unreasonable for the University of Tulsa to apply its alleged evidentiary rule. We base this conclusion on guidance from the U.S. Department of Education's Office for Civil Rights.

This guidance indicates that it "may be helpful" for schools to consider evidence of prior acts of sexual harassment when there has been a finding of responsibility:

> If there is a dispute about whether harassment occurred or whether it was welcome . . . [,] [t]he following types of information may be helpful in resolving the dispute:
>
> . . . .
>
> • Evidence that the alleged harasser has been found to have harassed others may support the credibility of the student claiming the harassment . . . .

Office for Civil Rights Guidance at 9. This guidance does not recommend use of prior reports in the absence of a finding of responsibility. Thus, the University of Tulsa's alleged evidentiary rule conforms to this guidance.

26

Ms. Ross does not argue that the use of this rule was inherently unreasonable.[11] Rather, she argues that using this rule at the hearing was clearly unreasonable because the University of Tulsa had failed to properly investigate Mr. Swilling's past acts.

This argument fails because further investigation, standing alone, would not have permitted consideration of Mr. Swilling's alleged acts of sexual harassment in the past. The summary-judgment record contains unrebutted evidence that university policy would permit consideration of these alleged acts only if there had been a separate hearing, trial, or similar proceeding that had resulted in a finding of responsibility on the part of Mr. Swilling.

---

[11]     Ms. Ross argues that the university's dean of students acknowledged that use of this evidentiary rule had been unreasonable. Appellant's Opening Br. at 42 n.7 ("[Dean Taylor] has since acknowledged that she knew the school was acting unreasonably in failing to consider the prior accusations of sexual assault against Mr. Swilling."). This characterization is inaccurate. Dean Taylor was asked about using past sexual-harassment allegations in a conduct hearing; she responded that she would "like to be able to use all of the information," but understood from counsel that she could not do that. Appellant's App'x, vol. V at 1090. Dean Taylor did not say or imply that she regarded exclusion of the prior allegations as "unreasonable."

Similarly, Ms. Ross argues that Dean Taylor "acknowledged that had she been permitted to consider all four sexual misconduct allegations against Swilling, the outcome would have been different." Appellant's Opening Br. at 3. But Ms. Ross elsewhere acknowledges that Dean Taylor corrected this testimony with an erratum, "chang[ing] 'would' to 'could.'" Appellant's Opening Br. at 42 n.7. But even if Dean Taylor believed that the outcome would have been different, exclusion of the evidence would not have been clearly unreasonable.

In her reply brief, Ms. Ross shifted her argument, contending that the university should also have adjudicated Mr. Swilling's responsibility for other alleged acts of sexual harassment prior to adjudicating his responsibility for the alleged rape of Ms. Ross. This argument is waived, for it did not appear in the opening brief. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994) ("[A]ppellant failed to raise this issue in his opening brief and, hence, has waived the point.").

The argument also fails as a matter of law. Prior to Ms. Ross's report, the only university officers that knew about the incident with J.M. were campus-security officers. And the two other reports about Mr. Swilling were unknown even to campus-security officers prior to Ms. Ross's report. By the time others at the university learned of the incident involving J.M., she had already left the university and indicated that she did not want to participate in a student-conduct hearing. Similarly, a second alleged victim had refused to file a complaint or to speak with anyone at the university about the incident. And a third alleged victim had never even attended the University of Tulsa.

In addition, summary-judgment evidence indicates that

- when an alleged victim refuses to participate in a hearing, it can become more difficult for the school to find the alleged aggressor responsible for misconduct and

- university policy prevents hearings from taking place when the victim refuses to even give a statement to the university.

And there is no evidence that Ms. Ross had asked the University of Tulsa to adjudicate responsibility for the other alleged acts prior to the hearing on her own student-conduct complaint.

In our view, the university did not act in a way that was clearly unreasonable by failing to sua sponte adjudicate Mr. Swilling's responsibility for the prior reports of sexual harassment.

## B. The Alleged Failure to Consider Guidance from the Office for Civil Rights

Ms. Ross does not argue that any of the university's policies are inherently unreasonable, but the amici do. They argue that the district court erred by failing to consider applicable federal guidance in determining the validity of the university's evidentiary rule. In the amici's view, "the exclusion of evidence of prior sexual violence in student disciplinary hearings 'could lead to a "target rapist" on a college campus being repeatedly accused but repeatedly cleared despite a pattern of the same conduct.'" Amici Br. at 16 (quoting *Ross v. Univ. of Tulsa*, 180 F. Supp. 3d 951, 972 (N.D. Okla. 2016)). In the view of the amici, this result would be absurd. But the university's application of its rule conforms to the federal guidance. *See* Part IV(A), above. Thus, it was not absurd for the University of Tulsa to apply its evidentiary rule.

## C. The District Court's Alleged Reliance on the Defense of Good-Faith Reliance on Counsel

Ms. Ross argues that the district court erred in crediting the defense of good-faith reliance on counsel. According to Ms. Ross, the University of Tulsa "neither asserted this defense in its summary judgment briefing nor offered any evidence necessary to meet its burden of proving the defense." Appellant's Reply Br. at 19. For the sake of argument, we may assume that (1) the district court drew this conclusion and (2) this conclusion was erroneous. But these assumptions would not affect the outcome, for the University of Tulsa would prevail as a matter of law even without a defense involving good-faith reliance on counsel.

## D. The Actions of the University's Outside Counsel

At oral argument, Ms. Ross also contended that the university's outside counsel was an appropriate person for purposes of Title IX. This contention was presented for the first time at oral argument, which was too late. *See Lebahn v, Nat'l Farmers Union Uniform Pension Plan*, 828 F.3d 1180, 1188 n.8 (10th Cir. 2016) (stating that arguments made for the first time at oral argument are waived). Therefore, we decline to consider this argument.

\* \* \*

We conclude that a reasonable fact-finder could not find that the University of Tulsa had responded to Ms. Ross's report in a way that was

30

clearly unreasonable. Thus, Ms. Ross's second theory fails as a matter of law.

## V.     Disposition

The district court awarded summary judgment to the University of Tulsa. We affirm, rejecting Ms. Ross's two theories.

On the first theory, Ms. Ross is correct that a fact-finder could reasonably conclude that (1) the reports about J.M. had put campus-security officers on notice of a rape and (2) the campus-security officers acted with deliberate indifference by dropping their investigation into the reported rape of J.M. But based on Ms. Ross's arguments, the fact-finder could not reasonably conclude that campus-security officers were appropriate persons. Thus, Ms. Ross's first theory fails as a matter of law.

Ms. Ross's second theory also fails, for it was not clearly unreasonable for the university to apply its policy excluding evidence of other sexual harassment in the absence of a prior finding of responsibility.

Affirmed.

31